# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION
### 3:14-cv-575-RJC
### (3:08-cr-134-RJC-DSC-6)

| | | |
|---|---|---|
| ELVIN PASTOR FERNANDEZ-GRADIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**THIS MATTER** is before the Court on Petitioner's Motion to Vacate, Set Aside, or

Correct Sentence pursuant to 28 U.S.C. § 2255, (Doc. No. 1), on the Government's Response,

(Doc. No. 9), on the Government's Motion for Extension of Time to File Response/Reply, (Doc.

No. 10), on Petitioner's Motion to Amend/Correct and Supplement Motion to Vacate, (Doc. No.

11), on the Government's Response to Petitioner's Motion to Amend/Correct Motion to Vacate,

(Doc. No. 17), and on Petitioner's Reply, (Doc. No. 18).

## I.    BACKGROUND

### A.  Offense Conduct

Beginning in the early 2000s, law enforcement officers began investigating the MS-13 street

gang and its criminal activities in Charlotte and surrounding areas.  See (Crim. Case No. 3:08-cr-

134-RJC-DSC-6, Doc. Nos. 877; 878; 1072-1085: Trial Tr.).  Petitioner Elvin Pastor Ferandez-

Gradis, whose gang moniker was "Tigre," was a member of the gang and an illegal alien.  (Id.,

Trial Tr. at 681; 1067-70).  During Petitioner's participation in the gang, members committed

murders and robberies, trafficked in controlled substances, and committed numerous other

attempted and completed acts of violence and intimidation.  See (Crim. Case No. 3:08-cr-134-RJC-DSC-6, Doc. Nos. 877; 878: Trial Transcripts).  Petitioner attended gang meetings, id. at 11-15, 281-83, 1234, during which members conducted business, such as "beating in" new members, collecting "taxes," meting out discipline, and planning, id. at 367, 563-64, 594-96.

As part of their ethic of violence and control during the time period of the charged racketeering conspiracy, Charlotte MS-13 members committed at least four murders.  The last of the four murders proved at trial occurred on April 12, 2008, when Petitioner, with co-defendant Santos Anibal Caballero Fernandez at his side, killed Ulisses Mayo, a young Hispanic male, at a neighborhood home where the owner, Vilma, sold food and beer.  (Id. at 1555; 1562; 1680; 1702).  Petitioner and Fernandez had been drinking there all night and into the morning hours, when family members arrived to prepare for the first birthday party for Vilma's grandson, to be held that evening.  (Id. at 1559-62; 1684-85).  During the party, Vilma's son Rafael Diaz noticed that Petitioner, who was inside drinking beer, had pulled a gun out and was showing it to patrons.  (Id. at 1592; 1687).  Diaz asked Petitioner to put the gun away because children were there for a birthday party, prompting Fernandez to become angry.  (Id. at 1593; 1704).

As the party was winding down and family members and friends were cleaning up, a guest, Ruben Ibarra, arrived, wearing red clothing.  (Id. at 1540; 1595-97; 1647; 1706).  Ibarra's cousin, Ulisses Mayo, remained in the car, sitting in the passenger's seat.  (Id. at 1537; 1643; 1648; 1650; 1707).  Seeing the red clothing, Petitioner and Fernandez immediately objected and threatened harm, while family members warned the guest to leave quickly.  (Id. at 1597-99; 1651-52; 1708-09).  After greeting Vilma and leaving a present for the child, Ibarra did so, getting into the driver's side of his car, but Petitioner and Fernandez followed quickly, with Petitioner pulling out his firearm, banging on the passenger's side window, and ordering the

2

passenger to roll it down.  (Id. at 1601-03; 1652; 1709).  Although Mayo hit the window and said that it did not work, Petitioner, with Fernandez by his side, shot Mayo through the passenger's window, with the bullet passing into his chest, killing him.  (Id. at 1531; 1604; 1618-19; 1652; 1670-75; 1709-10; 1751-54; 1756; see also id. at 1402).  When Mayo was hit, he gasped and moaned, saying, "aye, aye."  (Id. at 1604; 1653).  Ibarra drove off as Petitioner continued to shoot.  (Id. at 1520-21; 1529; 1604).  Meanwhile, Petitioner picked up spent shells, while Fernandez got his car and told Petitioner to get inside so they could follow Ibarra.  (Id. at 1711).

Charlotte MS-13 gang members regularly carried and used firearms.  In October 2006, law enforcement officers stopped a car in which Fernandez and Petitioner were passengers, seizing a loaded firearm and ammunition from the middle right of the back seat, where Petitioner had been sitting immediately behind Fernandez, whom officers had observed twisting around in Petitioner's direction.  (Id. at 1478-83).  In May 2008, officers stopped a car with six people inside, including Fernandez, who was sitting in the middle of the back seat.  (Id. at 1498-1503).  Officers saw Fernandez bending over and ultimately found a loaded handgun on the floorboard in the back seat area of the car, as well as two handguns under the driver's seat.  (Id. at 1503-04).  One of the guns seized during the traffic stop was ultimately determined to be the same gun that Petitioner had used on the night he killed Ulisses Mayo.  (Id. at 1507; 1751-53).

**B. Petitioner is convicted of numerous offenses and sentenced to 204 months in prison.**

Petitioner was indicted by the grand jury and charged with membership in MS-13, as well as conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d) (Count 1).  (Id., Doc. No. 623: Third Superseding Indictment).  Petitioner was also charged with murder in aid of racketeering, 18 U.S.C. § 1959(a)(1) (Count 51); use of a firearm during and in relation to a

3

crime of violence resulting in death, in violation of 18 U.S.C. §§ 924(c) and (j)(1) (Count 52);

possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5) (Count 54); and

illegal re-entry following deportation, in violation of 8 U.S.C. § 1326(a) (Count 55).  (Id.).

Before trial, the Government requested an anonymous jury, arguing that, in addition to

the defendants' membership in MS-13, the evidence would show that four murders were

committed during the course of the racketeering conspiracy and that at least some of the

defendants had attempted to obstruct justice and had discussed attempts to locate and intimidate

informants and cooperators.  (Id., Doc. No. 778 at 4-5: Govt.'s Mot. for an Anonymous Jury).

The Government noted that the jury would be shown some of the defendants' jail mail that

included threats and that, while the threats concerned law enforcement officers, informants, and

cooperators, reasonable jurors could conclude that MS-13 members threaten all who get in their

way and, based on the trial evidence, that other MS-13 members remained at large.  (Id. at 6).

The Government noted further that each of the defendants faced lengthy terms of imprisonment,

if convicted, and that the case had already received extensive publicity, publicity that would

resume once trial commenced.  (Id.).  The Government acknowledged that it was important for

the Court to take precautions to protect the defendants' constitutional rights, if it permitted an

anonymous jury, by instructing the jury that the anonymity of the jurors had nothing to do with

the defendants' guilt or innocence.  (Id. at 7).  The Government also encouraged this Court to

"conduct voir dire in such a way to uncover any bias" against the defendants.  (Id.).

After considering the Government's motion and the objections filed by two of

Petitioner's co-defendants, this Court granted the Government's motion, finding that "there

[was] strong reason to believe the jury need[ed] protection," that one of the alleged core

principles of the MS-13 gang is the intimidation of witnesses and the violent punishment of

cooperators, and that the indictment alleged efforts by certain defendants to obstruct justice in this case. (<u>Id.</u>, Doc. No. 819 at 4). The Court concluded that the Government had met its burden to connect the defendants with a criminal organization with the capacity to harm jurors and the willingness to obstruct justice. (<u>Id.</u>). The Court noted that all of the defendants faced charges carrying penalties of up to 20 years in prison or life and that the media coverage of the case had already been extensive and would continue through the trial. (<u>Id.</u> at 5). The Court concluded that "there [was] a likelihood of obstruction of justice and a pattern of violence . . . that would cause . . . jurors to reasonably fear for their own safety," but the Court also stated that it would "take reasonable precaution[s] at trial to minimize any prejudicial effect of [the court's] decision on the defendants and to protect their fundamental rights." (<u>Id.</u>).

In its preliminary instructions to the jury, this Court acknowledged that the jurors may have noticed that certain security measures had been taken at the courthouse. (<u>Id.</u>, Doc. No. 1466 at 22: Tr. of Pretrial Mot. and Opening Statements). The Court explained that these measures were "standard in every case" and should not, in any way, be considered by the jurors. (<u>Id.</u>). The Court emphasized that each defendant was presumed innocent until proven guilty and that each defendant, therefore, "starts out with a clean slate." (<u>Id.</u>).

Following the parties' evidence, the Court instructed the jury. In instructing the jury that they were "the sole judges of the credibility of the witnesses, and the weight their testimony deserves," this Court instructed the jury that the jury could consider whether a witness had any motive or reason for being truthful or untruthful and "whether there appeared from the witness' attitude or conduct any bias, prejudice or feeling which may cause that person's testimony to be influenced." (<u>Id.</u>, Doc. No. 1467 at 9-10: Tr. of General Instr. by the Court and Closing Arguments by Counsel). The Court also instructed the jury that "[t]he testimony of an alleged

accomplice and the testimony of one who provides evidence against a defendant as an informer for pay or for benefits in a plea agreement, or for personal advantage or vindication, must always be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses." (Id. at 12). The Court instructed the jury that it "must decide whether the witness' testimony has been affected by any of those circumstances, or by the witness' interest in the outcome of the case, or by prejudice against the defendant, or by the benefits that the witness has received, either financially or as a result of a plea agreement." (Id. at 12-13). Finally, this Court instructed the jury that they should "keep in mind that such testimony is always to be received with caution and weighed with great care" and that the jury "should never convict any defendant upon the unsupported testimony of such a witness unless [the jury believed] that testimony beyond a reasonable doubt." (Id. at 14).

In instructing the jury on the aiding-and-abetting theory of liability, this Court instructed the jury that "[i]f another person is acting under the direction of the defendant, or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons." (Id., Doc. No. 1468 at 42: Tr. of Jury Charge and Verdict). This Court instructed further that "[b]efore any defendant may be held criminally responsible for the acts of others, it is necessary that the accused deliberately associate himself in some way with the crime, and participate in it with the intent to bring about the crime." (Id.). This Court instructed the jury that to "associate with criminal venture" means that the defendant "shared the criminal intent of the principal"—an element that cannot be satisfied if the defendant had no knowledge of the principal's criminal venture. (Id. at 42-43). Finally, for purposes of the aiding-and-abetting instruction, this Court instructed the jury that to "participate in the criminal venture" means that the defendant "engaged in some affirmative

conduct, designed to aid the venture, or assisted the principal of the crime." (<u>Id.</u> at 43).

At the conclusion of the trial, the jury convicted Petitioner on all charges. (<u>Id.</u>, Doc. No. 843: Jury Verdict). In addition to finding Petitioner guilty of the racketeering offense, the jury also found specifically that Petitioner's agreement to participate in the racketeering organization included the murder of Ulisses Mayo. (<u>Id.</u>). This Court sentenced Petitioner to life in prison as to the racketeering-conspiracy and murder-in-aid-of-racketeering offenses; to 120 months in prison for the alien-in-possession offense to be served concurrently; to 24 months in prison for the illegal re-entry offense to be served concurrently; and to life in prison for the § 924(j) offense to be served consecutively. (<u>Id.</u>, Doc. No. 1406: Judgment). Petitioner appealed, challenging the sufficiency of the evidence against him, the empaneling of an anonymous jury, and the failure of the Court to give an instruction on multiple conspiracies. The Fourth Circuit affirmed this Court's judgment on May 14, 2013, rejecting each of Petitioner's arguments. <u>United States v. Fernandez</u>, 526 F. App'x 270, 285 (4th Cir. 2013).

Petitioner now seeks post-conviction relief based on the alleged ineffective assistance of counsel. The Government filed a response to Petitioner's motion to vacate on June 22, 2015. On August 20, 2015, Petitioner filed a motion to amend and supplement the memorandum of law he filed in support of his motion to vacate, supplementing his claim that his trial counsel, Joe Von Kallist, provided constitutionally ineffective representation related to the rejection of the Government's plea offer. The Government filed its response to the motion to amend on January 4, 2016, and Petitioner filed a reply on February 2, 2016.

## II.     STANDARD OF REVIEW

Rule 4(b) of the Rules Governing Section 2255 Proceedings provides that courts are to promptly examine motions to vacate, along with "any attached exhibits and the record of prior

proceedings . . ." in order to determine whether the petitioner is entitled to any relief on the claims set forth therein. After examining the record in this matter and the Government's Response, the Court finds that the arguments presented by Petitioner can be resolved without an evidentiary hearing based on the record and governing case law. See Raines v. United States, 423 F.2d 526, 529 (4th Cir. 1970).

## III. DISCUSSION

### A. Claims Raised in Petitioner's Initial Motion to Vacate

### 1. Petitioner's Ineffective Assistance of Counsel Claims

The Sixth Amendment to the U.S. Constitution guarantees that in all criminal prosecutions, the accused has the right to the assistance of counsel for his defense. See U.S. CONST. amend. VI. To show ineffective assistance of counsel, Petitioner must first establish a deficient performance by counsel and, second, that the deficient performance prejudiced him. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984). In making this determination, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689; see also United States v. Luck, 611 F.3d 183, 186 (4th Cir. 2010). Furthermore, in considering the prejudice prong of the analysis, the Court "can only grant relief under . . . Strickland if the 'result of the proceeding was fundamentally unfair or unreliable.'" Sexton v. French, 163 F.3d 874, 882 (4th Cir. 1998) (quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)). Under these circumstances, the petitioner "bears the burden of affirmatively proving prejudice." Bowie v. Branker, 512 F.3d 112, 120 (4th Cir. 2008). If the petitioner fails to meet this burden, a "reviewing court need not even consider the performance prong." United States v. Rhynes, 196 F.3d 207, 232 (4th Cir. 1999), opinion vacated on other grounds, 218 F.3d 310 (4th Cir. 2000).

**a. Trial counsel's failure to request an informant jury instruction.**

Petitioner first argues that his trial counsel, (now deceased) Joe Von Kallist, rendered constitutionally deficient representation because he failed to request an informant jury instruction designed "to allow the jurors to be able to better assess the informant's intentions for testifying." (Doc. No. 1 at 8). More specifically, Petitioner asserts that trial counsel improperly failed to request an instruction that "[t]he testimony of an informer who provides evidence against a defendant for pay or for immunity from punishment, or for personal advantage or vindication, must be examined or weighed by the jury with greater care than the testimony of an ordinary witness." (Id. at 9). This claim fails because this Court, in fact, provided just such an instruction, and this Court's instruction was, if anything, more protective of the defendants' interest in ensuring that the jury considered the possible motives of the informers' testimony than that Petitioner suggests should have been requested by his counsel. Because this Court provided the instruction Petitioner argues his counsel should have requested, Petitioner cannot show prejudice, even if he could show deficient representation.

**b. Failure of appellate counsel to challenge extra security measures.**

Petitioner next argues that his appellate counsel provided ineffective assistance of counsel in failing to argue on appeal that he was denied the right to a fair trial because of the extra security measures that were taken when certain witnesses who were in the witness protection program were testifying. This claim fails, first, because Petitioner does not specify what security measures were so visible and so prejudicial that the jury would infer that the defendant was especially dangerous. Cf. Holbrook v. Flynn, 475 U.S. 560, 569 (1986) (holding that the conspicuous deployment of security personnel in the courtroom cannot be presumed to be prejudicial). Second, this Court explicitly instructed the jury that the security measures were

routine and should not be considered by the jurors as evidence of the defendants' guilt. Finally, with respect to the appellate argument that Petitioner asserts should have been made, Petitioner's counsel <u>did</u> make the argument that this Court abused its discretion in taking the security measure of empaneling an anonymous jury, and the Fourth Circuit rejected that argument, holding that this Court properly took that extra security measure and properly downplayed this extra security measure. <u>See</u> <u>Fernandez</u>, 526 F. App'x at 277-78. Petitioner has not presented any legal authority suggesting that a challenge to the other security measures would have been successful on appeal, and he has, therefore, failed to prove either deficient representation or prejudice.

### c. Failure to challenge constitutionality of VICAR statute.

Petitioner next argues that trial counsel provided deficient representation in failing to challenge the statute prohibiting murder in aid of racketeering as unconstitutional because it regulates local activity that lies beyond Congress's authority to regulate under the Commerce Clause.[1] In <u>United States v. Umana</u>, 750 F.3d 320 (4th Cir. 2014), <u>cert. denied</u>, — S. Ct. —, 2015 WL 2473391 (June 22, 2015), the Fourth Circuit rejected the same constitutional argument, holding that Congress could rationally conclude that "intrastate acts of violence, such as murder, committed for the purpose of maintaining or increasing one's status in an interstate racketeering enterprise, would substantially affect the interstate activities of that enterprise." <u>Id.</u> at 336.

The Fourth Circuit also rejected the argument that application of the statute to the defendant's particular circumstances is unconstitutional, noting that the Commerce Clause analysis "does not focus on whether particular conduct under the statute had an impact on

---

[1] Petitioner was convicted under 18 U.S.C. § 1959, titled "Violent Crimes in Aid of Racketeering Activity," and commonly referred to as the "VICAR" statute.

interstate commerce, but rather on whether 'the class of acts proscribed had such an impact.'"

Id. at 337 (quoting United States v. Gilbert, 677 F.3d 613, 627 (4th Cir. 2012)).  Under Umana, this claim therefore fails.

### d. Failure to challenge closing argument on appeal.

In his second claim of ineffective assistance of counsel related to his appellate counsel, Petitioner asserts that his appellate counsel improperly failed to challenge the prosecutor's closing argument.  As the Fourth Circuit has made clear, only comments that "so infected the trial with unfairness" can be said to violate due process.  United States v. Runyon, 707 F.3d 475, 510 (4th Cir. 2013).  Additionally, in order to establish prosecutorial misconduct, a petitioner must show both (1) government remarks that were in fact improper; and (2) the remarks prejudicially affected the defendant's substantial rights so as to deprive the petitioner of a fair trial.  Id. at 510-11.

Here, Petitioner asserts that the prosecutor improperly argued that Petitioner and his co-defendants "were devil worshippers and in a league with the devil," denying him the right to a fair trial.  (Doc. No. 1 at 24).   However, the prosecutor did not call the defendants devil worshippers, stating specifically that he "[would not] go so far as to say that MS-13 is devil worshippers."  (Id., Doc. No. 1467 at 22: Tr. of General Instr. by the Court and Closing Arguments by Counsel).  Instead, the prosecutor noted that the defendants used the symbolism of the devil "to intimidate, and to control," as evidenced by the tattoo on one of the defendants' head depicting the devil.  See id.  Because the evidence established that the members of MS-13, in fact, used hand signs and tattoos that referenced the devil, this argument was proper, and Petitioner cannot show that this argument was improper or that it prejudiced Petitioner. Particularly in light of the overwhelming evidence of Petitioner's guilt, Petitioner cannot show

that there was any reasonable probability that a challenge to these comments would have succeeded on appeal, particularly where trial counsel did not challenge the comments and the issue would have been reviewed for plain error.  See Umana, 750 F.3d at 351.  Petitioner, therefore, has not shown that appellate counsel's failure to challenge the prosecutor's arguments on direct appeal constituted deficient representation, nor has he shown prejudice.

**e. Trial counsel's closing argument.**

Petitioner next asserts that trial counsel improperly conceded Petitioner's guilt during counsel's closing argument on Petitioner's behalf.  As support, Petitioner quotes a single sentence from counsel's closing argument in which counsel stated that if the jury did not agree with "what [he was] about to say, [they should] convict [his] client."  (Doc. No. 1 at 26). Because this sentence, read in isolation, does not support Petitioner's argument, this claim fails. However, particularly when this statement is considered in context, Petitioner's claim fails. After making the statement Petitioner challenges, Petitioner's trial counsel went on to describe the witness intimidation that occurred during Petitioner's trial, asserting that the witnesses against Petitioner were intimidated into identifying Petitioner, rather than another of Petitioner's co-defendants.  While Petitioner's counsel did not deny that Petitioner was a member of MS-13, he did argue that Petitioner was not guilty of Mayo's murder and that the Government had not presented any evidence that Petitioner had participated in any other act in furtherance of the racketeering organization.  Read fairly, then, trial counsel's argument was not an admission of Petitioner's guilt and was, instead, an argument plainly calculated to obtain an acquittal for Petitioner.  Additionally, given the testimony establishing that Petitioner had killed Mayo, counsel's strategy of challenging the credibility of those witnesses based on witness intimidation was reasonable.  Having failed to show either deficient representation or prejudice based on

counsel's closing argument, this claim fails.

### f. Failure to request a special verdict.

Challenging the jury's verdict as a general verdict, Petitioner next argues that his trial counsel failed to request a special verdict to clarify the statute supporting the conspiracy verdict against Petitioner and that appellate counsel failed to challenge the lack of a special verdict. According to Petitioner, he was charged with conspiring to violate multiple statutes that carried different sentencing ranges, and the lack of a special verdict resulted in a sentence higher than the jury's verdict might have supported. Petitioner's argument, however, misapprehends 18 U.S.C. § 1962(c), which proscribes an individual's participation in a racketeering enterprise. Although the indictment alleged that Petitioner participated in a pattern of racketeering activity that included multiple acts in violation of federal and state law, including acts of robbery in violation of the Hobbs Act, drug-trafficking offenses in violation of the Controlled Substances Act, and murder, in violation of state law, the jury did not need to find a conspiracy in violation of any of those laws. In fact, the jury specifically found that Petitioner was guilty of agreeing to support the racketeering enterprise through the premeditated murder of Mayo. Therefore, the jury found not only that Petitioner conspired to participate in a pattern of racketeering but that, as part of that conspiracy, he committed the specific act of murder. Because Petitioner has not identified any error in the indictment or the jury's verdict, his claims of ineffective assistance of counsel based on the jury's verdict fail.

### g. Failure to convey acceptance of plea agreement.

Petitioner next asserts that he was offered a plea agreement that would have resulted in a 20-year sentence, that he wanted to accept that plea agreement, and that trial counsel "did not allow the Petitioner to accept the plea offer." (Doc. No. 1 at 32). Although the Supreme Court

has made clear that a defendant's Sixth Amendment right to effective assistance of counsel extends to the plea-bargaining phase of a criminal case, see <u>Lafler v. Cooper</u>, 132 S. Ct. 1376 (2012); <u>Missouri v. Frye</u>, 132 S. Ct. 1782 (2012), Petitioner's claim in this case fails, because he has not presented any competent evidence that his trial counsel, Mr. Von Kallist, failed to convey his acceptance of a Government plea offer. The Government notes in its response that Petitioner's trial counsel died after a long illness on March 20, 2015. The Government, therefore, could not obtain an affidavit from him refuting Petitioner's claim that he "refused" to permit Petitioner to plead guilty. In any event, as the Government notes, Petitioner has not presented any competent evidence that Von Kallist failed to convey the Government's plea offer to Petitioner or Petitioner's response to the Government, and at no time did Petitioner alert this Court on the record that he wanted to plead guilty. Petitioner's motion to vacate is not signed in this case, and he has failed to present any sworn statement supporting his claim.[2] Additionally, at no time during the trial or sentencing proceedings related to Petitioner did Petitioner assert that he sought to accept a Government plea offer, nor has he established, as he asserts, that he is "actual[ly] innocent of the sentence" imposed. Because Petitioner has presented no evidence supporting this ineffective-assistance-of-counsel claim, it is denied.

**h. Failure to move to suppress cell-phone evidence.**

In his final claim of ineffective assistance of counsel, Petitioner argues that trial counsel improperly failed to move for the suppression of evidence taken from a cell phone. First, this claim fails because Petitioner does not specify which evidence he believes was improperly taken

---

[2] On initial review, the Court noted that the petition had not been signed, and the Court instructed Petitioner to sign and return the petition under penalty of perjury, but Petitioner never did return the petition signed under penalty of perjury. <u>See</u> (Doc. No. 2).

and admitted and whether that evidence was taken from his cell phone or one of his co-defendants' phones.  Assuming he is challenging evidence taken from Petitioner's own cell phone, however, his claim of ineffective assistance still fails.  While the Supreme Court recently held in Riley v. California, 134 S. Ct. 2473, 2493 (2014), that "a warrant is generally required" before officers may search a cell phone incident to an arrest, that decision effectively overruled Fourth Circuit case law (which was the law in the circuit at the time of Petitioner's trial), in which the court had held that officers could search the contents of a suspect's cell phone incident to the suspect's arrest, consistent with the Fourth Amendment, see United States v. Murphy, 552 F.3d 405, 411 (4th Cir. 2009).  Because Petitioner cannot show that there is a reasonable probability that a challenge to the seizure and search of his cell phone would have succeeded, he cannot show either deficient representation or prejudice.

### 2. Petitioner's Rosemond and prosecutorial-misconduct claims.

In addition to arguing ineffective assistance of counsel, Petitioner also asserts that this Court improperly instructed the jury on aiding and abetting, in violation of Rosemond v. United States, 134 S. Ct. 1240 (2014), and that the prosecutor violated his right to a fair trial through improper argument to the jury.  These claims fail because Petitioner did not present this argument in this Court or on direct appeal and because Petitioner cannot show that he is actually innocent of any charged offense.  Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised on collateral review only if the defendant can first demonstrate cause and actual prejudice, or that he is actually innocent of the conviction he challenges.  Bousley v. United States, 523 U.S. 614, 622 (1998).  As the Fourth Circuit explained in United States v. Jones, 758 F.3d 579 (4th Cir. 2014), "the [Supreme] Court has been clear that 'habeas corpus petitions that advance a substantial claim of actual innocence

are extremely rare' and the exception only applies in limited circumstances:  'The petitioner must show that it is more likely than not that no reasonable juror would have convicted him . . . .'"  <u>Id.</u> at 583 (brackets omitted) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)).  With respect to the cause-and-prejudice standard, a petitioner must demonstrate (1) the existence of cause for a procedural default that turns on something external to the defense; and (2) actual prejudice resulting from the errors of which he complains.  <u>United States v. Pettiford</u>, 612 F.3d 270, 280 (4th Cir. 2010).  In <u>Rosemond</u>, the Supreme Court held that in order to prove that a defendant aided and abetted the offense of using or carrying a firearm during and in relation to a crime of violence or drug-trafficking crime, the government must show "that the defendant actively participated in the underlying drug trafficking or violent crime with advance knowledge that a confederate would use or carry a gun during the crime's commission."  134 S. Ct. at 1243.  The Supreme Court held that a person is liable under 18 U.S.C. § 2 for aiding and abetting an offense if he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission.  <u>Id.</u> at 1245.

As applied in the context of § 924(c), a defendant need only take an affirmative act in furtherance of either the use of a firearm or the commission of a drug-trafficking or violent offense.  <u>Id.</u> at 1247.  It is not necessary that the defendant's acts "advance each element of the offense; all that matters is that they facilitate[] one component."  <u>Id.</u>  With respect to the intent requirement, however, aiding and abetting liability requires "a state of mind extending to the entire crime."  <u>Id.</u> at 1248.  Thus, as applied in the context of § 924(c), the defendant must know that one of his confederates will carry a gun "at a time [he] can do something with it—most notably, opt to walk away."  <u>Id.</u> at 1249-50.  Having defined aiding-and-abetting liability in the context of § 924(c), the Court in <u>Rosemond</u> vacated the defendant's § 924(c) conviction, because

16

the district court's instructions to the jury permitted the jury to find the defendant guilty without a finding that the defendant had advance knowledge of the firearm. <u>Id.</u> at 1251-52. The Court also recognized that where a defendant continues to participate in a crime after a gun is displayed or used by a confederate, a jury may permissibly infer that a defendant has advance knowledge. <u>Id.</u> at 1250 n.9.

Here, Petitioner cannot show that he is actually innocent under <u>Rosemond</u> because the evidence at trial established that he directly committed each of the offenses of which the jury found him guilty. The jury found that Petitioner participated in the racketeering conspiracy and committed first-degree murder in furtherance of that conspiracy. Because the evidence established that Petitioner pulled the trigger of the firearm that killed Mayo, he was directly liable for the murder, as well as for the use of the firearm during and in relation to a crime of violence and his possession of the firearm as an illegal alien without any reliance on an aiding-and-abetting theory of criminal liability. Even if this Court's instructions to the jury were somehow faulty under <u>Rosemond</u>, Petitioner has not shown that he would have been found not guilty had the aiding-and-abetting instruction been worded differently. Because he cannot show his innocence of these offenses and has not shown either cause or prejudice resulting from this Court's instructions, his claim is procedurally defaulted.

Petitioner also asserts a claim of prosecutorial misconduct based on closing arguments, but this claim, also, is procedurally barred, because Petitioner did not make this argument on direct appeal and he cannot show, in any event, that the failure to make this argument prejudiced him. As discussed above, the comments Petitioner challenges were proper in light of the evidence presented at trial, and even if they were improper, the evidence against Petitioner was so overwhelming that he cannot show that the comments prejudiced him.

**B. Petitioner's Motion to Amend**

In Petitioner's initial motion to vacate, he asserted generally that Von Kallist provided ineffective assistance of counsel by "failing to accept the Government's plea negotiation to no more than twenty (20) years." (Doc. No. 1 at 31: Pet. Mem. Supp. Mot. to Vacate). Petitioner also asserted that Von Kallist "did not allow" him to accept the plea offer by the Government, which would have resulted in a sentence of "no more than 20 years." (<u>Id.</u> at 32). Noting that Petitioner had not signed his motion to vacate, had presented no sworn statement supporting his claim, and had presented only unsupported conclusory allegations, the Government argued that Petitioner's claim failed as a matter of law.

Petitioner now, in a signed but unsworn pleading, seeks to amend this claim to assert that the Government made two plea offers to Petitioner, one offering a 22-year prison sentence and one offering a 25-year prison sentence. (Doc. No. 11 at 2-3: Pet. Mot. to Amend). Petitioner asserts that Von Kallist pressured him to reject the Government's proposed plea offers, telling Petitioner that the United States Attorney's Office could not be trusted and that the Government would not be able to prove that Petitioner shot Ulisses Mayo. (<u>Id.</u> at 2). Petitioner asserts further that he ended up going to trial "with a distorted view of what the whole case against him and his cohorts truly meant" and that Von Kallist failed to explain that if he went to trial and lost, he faced a sentence much longer than that offered in the Government's plea offers. (<u>Id.</u> at 3; 7). Petitioner asserts that, as a result of his functional illiteracy, his post-arrest depression and anxiety, and his brother's detention, Von Kallist was able to coax him "to opt for trial against all odds." (<u>Id.</u> at 7-8). Petitioner also asserts that because of Von Kallist's misleading advice, he had "no other option than to follow [Von Kallist's] directives and proceed to trial." (<u>Id.</u> at 4).

In <u>Missouri v. Frye</u>, 132 S. Ct. 1399 (2012), and <u>Lafler v. Cooper</u>, 132 S. Ct. 1376

(2012), the Supreme Court held that a criminal defendant has a right to the effective representation of counsel during the plea-bargaining stage of the prosecution and that whether this right was abridged is governed by the familiar standard described in Strickland v. Washington, 466 U.S. 668 (1984). Frye, 132 S. Ct. at 1405-06; Lafler, 132 S. Ct. at 1384. In Frye, the Court held that this right is abridged when a defense lawyer allows a government offer to expire without advising the defendant of the offer or permitting him to consider the government's offer. Frye, 132 S. Ct. at 1408. In Lafler, the Court held that this right was abridged when a defendant rejected two plea offers based on counsel's advice that the prosecution would be unable to prove that he shot the victim with intent to murder her because the victim had been shot below the waist. Lafler, 132 S. Ct. at 1383. The parties in Lafler agreed that counsel's representation was deficient when he advised the defendant to reject the plea offer on the grounds he could not be convicted at trial. Id. Applying Strickland, the Court in Lafler held that where a defendant argues that deficient advice resulted in his rejection of a favorable plea offer, he must show, in addition to the deficient advice, that (1) but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court, (2) that the court would have accepted its terms, and (3) that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. Id. at 1385.

Petitioner has not presented any competent evidence that Von Kallist rendered ineffective assistance of counsel under either Frye or Lafler. Petitioner's motion to vacate is not signed in this case, and he has failed to present any sworn statement supporting his claim. On this basis alone, Petitioner's motion fails to create a factual issue regarding whether he was denied his constitutional right to effective assistance of counsel. See United States v. Gonzalez, 493 F.

App'x 541, 544 (5th Cir. 2012) (unpublished) (rejecting defendant's ineffective-assistance-of-counsel claim under <u>Lafler</u> and <u>Frye</u> where the defendant's allegations were unsworn and the record was devoid of "independent indicia of the likely merit of [the defendant's] unsworn allegations that counsel failed to inform him of any plea offer or to provide him with accurate advice regarding his sentencing exposure"); <u>Haouari v. United States</u>, 510 F.3d 350, 354 (2d Cir. 2007) (holding that unsworn statement was not competent evidence supporting habeas review); <u>see also</u> <u>United States v. Erickson</u>, 561 F.3d 1150, 1164 (10th Cir. 2009) (rejecting defendant's argument that district court improperly denied motion for new trial, where the only evidence the defendant presented in support of his motion was an unsworn letter that could not support relief).

Additionally, although Petitioner asserts generally that Von Kallist improperly advised him to decline the Government's plea offers, he has not alleged that Von Kallist failed to communicate those offers, sufficient to warrant relief under <u>Frye</u>, and his claim that Von Kallist advised him that the Government could not prove that he shot Mayo is not credible, even without a response from his deceased trial counsel. Petitioner shot Mayo in the presence of numerous eyewitnesses, including Ruben Ibarra, the driver of the car in which Mayo was a passenger at the time he was shot. After Petitioner shot Mayo through the window of the car, Ibarra drove off while Petitioner continued firing shots at the car. In light of the public nature of Petitioner's shooting of Mayo and the lack of any competent evidence supporting Petitioner's assertion that Von Kallist advised Petitioner that the Government could not prove that he shot Mayo, his claim under <u>Lafler</u> that he was advised that the Government could not prove that he shot Mayo fails as a matter of law.

Similarly, Petitioner's claim that Von Kallist advised him not to plead guilty because he could not trust federal prosecutors also fails. Petitioner does not provide any details of his

conversation with Von Kallist or explain the alleged basis of Von Kallist's assertion that the United States Attorney's Office could not be trusted. Nor does Petitioner explain why trust of the United States Attorney's Office was even necessary to support a decision to plead guilty, where the plea offers would have been in writing and where this Court would have been required to enforce the parties' agreement, even if the Government sought to breach the agreement for some reason. Petitioner's <u>Lafler</u> claim based on counsel's alleged assertion that the United States Attorney's Office could not be trusted also fails.

For the reasons stated herein, the Court finds that the new claims Petitioner raises in his motion to amend are without merit. Furthermore, as the Government notes in its brief, Petitioner's assertions shifted significantly between the memorandum filed in support of his motion to vacate and the motion to amend and supplement that memorandum. In the first memorandum, Petitioner asserted that he received an offer to plead guilty and receive a sentence under 20 years in prison. In the motion to amend, he now asserts that he received two plea offers that would have resulted in sentences of 22 years and 25 years, respectively. Petitioner also asserted in his first memorandum that Von Kallist "did not allow" him to plead guilty, implying that he instructed Von Kallist to accept the Government's plea offer(s) but that Von Kallist refused to communicate that acceptance. In his most recent pleading, however, Petitioner acknowledges that he decided not to accept the plea offer(s), although he blames this decision on depression, anxiety, and misadvice from Von Kallist. Particularly in light of the fact that Petitioner has not presented any sworn statement under the penalty of perjury, these shifting explanations merely only bolster the Government's argument that Petitioner's claim fails for lack of proof. In sum, for all these reasons, the Court finds that the additional arguments and claims asserted in Petitioner's motion to amend are without merit.

## IV. CONCLUSION

For the reasons stated herein, the Court will dismiss the § 2255 petition.

**IT IS, THEREFORE, ORDERED** that:

1. Petitioner's § 2255 motion to vacate, (Doc. No. 1), is **DENIED** and **DISMISSED** with prejudice.

2. Petitioner's Motion to Amend/Correct and Supplement Motion to Vacate, (Doc. No. 11), is **GRANTED** to the extent that the Court has considered the additional claims made in Petitioner's motion to amend, but finds that Petitioner's additional claims are without merit.

3. The Government's Motion for Extension of Time to File Response/Reply, (Doc. No. 10), is **GRANTED** nunc pro tunc.

4. Pursuant to Rule 11(a) of the Rules Governing Section 2255 Cases, this Court declines to issue a certificate of appealability as Petitioner has not made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); Miller–El v. Cockrell, 537 U.S. 322, 336-38 (2003) (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong).

Signed: September 27, 2016

Robert J. Conrad, Jr.
United States District Judge